GEORGE F. RIDER ET AL. *vs.* CHARLES WHITE ET AL.

EQUITY. No. 4152.

{ Decided October 27, 1884.
{ Justices MAC ARTHUR, HAGNER and JAMES sitting.

1. A court of equity will not allow a debtor who has conveyed his property with intent to defraud his creditors, to impugn his deed, or aid him to extricate himself from the embarrassment created by his own wrong.
2. An executor, being a party to a suit, is an incompetent witness to invalidate a contract made by him personally with his decedent, and which is the subject of the suit.
3. A claim which has been suffered to sleep for nearly twenty years, with no effort to enforce it, will not be sustained by a court of equity when, in addition to suspicious circumstances surrounding it, there is no evidence going to satisfactorily explain the delay.

THE CASE is stated in the opinion.

FRANCIS MILLER for plaintiffs.

HINE & THOMAS for defendants.

Mr. Justice HAGNER delivered the opinion of the court.

This bill was filed by George F. Rider, claiming in his own right and as administrator of Lucy Rider, his mother, · in February, 1875, against Charles White and his wife, and Pearson, who was sued as trustee.

It alleged that on the 4th of September, 1854, White and his wife executed a conveyance to Pearson, as trustee, to secure the payment of seventeen notes which had been given by White, payable to the order of Rider; and also¯of a balance of one thousand and ninety-three dollars and seventy-seven cents, due by Rider to Mrs. Lucy Rider, his mother, on a promissory note which he had previously executed to her; that default had been made in the payment of several of the individual notes which were enumerated, and particularly that this balance of one thousand and ninety-three dollars and seventy-seven cents was still unpaid to Mrs. Lucy Rider; and it prayed that an account should be taken of these different demands, and that there should be foreclosure of the deed of trust.

There were two amendments of the bill; the last in 1879,

39

after a large mass of testimony had been taken. It appears from the evidence that on the 30th of April, 1851, Mrs. Rider lent her son, the complainant, $2,052.16, for which she received his note, payable three years after date, and secured by mortgage from George F. Rider to his mother of two lots of land, numbered twenty and twenty-one, in square D, South Washington, then occupied as an iron foundry by George F. Rider and Charles White, who were brothers-in-law. In 1854 the partners agreed to dissolve their business relations, and Rider sold out to White his interest in the foundry and these lots, for a large sum of money. The seventeen promissory notes were given to secure the payment of part of the purchase money, and, as a further consideration, White assumed the payment of this one thousand and ninety-three dollars and seventy-seven cents to Mrs. Rider, and to secure all this indebtedness, White executed this deed of trust to Pearson of the lots which had been previously conveyed to him by Rider.

The first defence set up by White was that he owed nothing whatever on the seventeen individual notes given on account of the purchase; and among other evidences of this, he alleged that in 1865 the question of this indebtedness had been submitted to the arbitration of Messrs. Mattingly and Wood, with power to call in a third person; that Mr. Bradley had been called in as umpire; and the result of that investigation disclosed, that so far from White being in debt to Rider, the reverse was found to be the case; that thereupon Rider undertook to revoke the authority of Mattingly, the referee selected by him; but the remaining referee returned as his judgment, that the indebtedness of Rider to White amounted to several thousand dollars. This part of the claim, after all the proof came in, was abandoned by the complainant Rider, and the only question contested in the court below, and now before us, relates to the responsibility of White on the Lucy Rider note.

With respect to this claim, the defence interposed by White was, that he had been entirely exonerated from its payment in 1855 under what he called a "family arrange-

ment" between himself and his brother-in-law. White insisted that Mrs. Lucy Rider, as executrix of her husband, the father of Mrs. White, was chargeable with considerable sums, and had paid nothing to her daughter, Mrs. White, on account of her distributive share; and that George F. Rider, who had received all the moneys of the estate, as agent of his mother, was really accountable for the payment of Mrs. White's share, and for that reason he agreed to reassume the payment of the balance of the note and release White from all further responsibility on account of that debt. And he further insisted that, after Rider had again, by that arrangement, assumed the payment of this balance, the debt itself had been paid by Rider, and was wholly released and extinguished. He, also, as a further defence, relied upon the staleness of the claim.

A large amount of testimony was taken, which we have gone through with the greater care, for the reason that the sum involved is below the amount necessary to justify an appeal elsewhere.

We find in proof, laying aside all questions as to the individual notes, that, after White had, in September, 1854, agreed to pay this balance, the complainant, George F. Rider, on the 13th of February, 1855, executed a deed of trust on another portion of his own property (lot 15, square 465), to Hamilton, as trustee, to secure the payment of this note to his mother. Afterwards, Mrs. Rider died, and by her will George F. Rider was made one of the two executors, and he was the only one who qualified. In 1866, a conveyance was executed by Hamilton, the trustee, in which Rider joined, as executor of Mrs. Rider, releasing this deed of trust from George F. Rider to Hamilton. And White insisted that not only was this balance discharged as to him under this family arrangement, by which he was released from further responsibility, and George F. Rider reassumed its payment, but, according to George F. Rider's own declaration, made in the deed of release, the deed of trust to Hamilton, by which he promised anew to pay it, was discharged."

The reply to this, made by Rider, is two-fold. First, he positively denied that there was any such family arrangement. He further insisted that, although he did, in 1855, execute a conveyance by which he apparently reassumed the responsibility for the debt, yet that this was merely done by him to prevent, hinder and delay a man named Morsell, who claimed to be his creditor, from recovering money which he did not believe he justly owed; and that the subsequent release, executed by him as executor, was made on the same consideration, and as part of the same device.

Such a defence, as a matter of course, is not to be tolerated by a court of equity. It would be a new departure, indeed, if the judges of a court of conscience were to consent to uphold the hands of a debtor who, in order to cheat his creditors, had covered up his property; and who after this part of his scheme of fraud has proved successful, finds himself embarrassed by the existence of his fraudulent deed, and asks the court to extricate him from the consequences of his wrongful act. If such a man should file a bill asking to have the deed set aside, the court would leave him to lie in the bed he had made for himself, and would refuse its aid. We do so here. Such a defence cannot be allowed to impugn his own deliberate formal act.

Again, we think the objection is well taken, that Rider himself is not a competent witness to invalidate the contract under seal made by him with his decedent, by which he bound himself to pay her this debt. Mrs. Rider is dead, and the surviving party to that contract cannot be heard to impugn it. Especially should this be so where, as in this case, the executor is a party, and is testifying in his own behalf, and on his own offer, to get clear of a claim against himself personally. And if Rider's testimony upon this point be rejected, there remains no evidence to sustain his contention in the case.

To show that White never supposed that he was discharged by the execution of the deed to Hamilton, Rider asserts that after he had executed the deed to Hamilton, namely, on the 2d of March, 1855, White paid two hundred dollars on the

Lucy Rider note; and he produced the note in court, on which is written: "March 2, 1855. Received on the within note $200." This endorsement is not signed, but it is admitted by White to be in his handwriting. The previous endorsement of a payment is signed by Mrs. Rider herself, and tested by a witness.

He further averred that at the time this payment was made, or shortly afterwards, a letter was written for Mr. White, by his clerk, and signed by the clerk in his behalf, to Mrs. Rider, stating that he enclosed two hundred dollars on account of this note. That letter is also produced in the handwriting of the clerk.

If the only evidence of this assertion were the testimony of Rider, offered in his own behalf, the assertion would be dismissed without further notice. But White admits that he believes the endorsement on the note is in his own handwriting, and that the letter is in the handwriting of the clerk. White testifies, in reply, that on the 2d of March, 1855, he did pay Rider two hundred dollars, but that he did not pay it on account of this note, and Rider did not ask it on that account; that he owed Rider money on account of the purchase, at that time, and Rider came to him and told him he wanted to send money to his mother as interest on this note, and he accordingly gave him a check for the $200; that Rider then asked him to write the memorandum on the note, and he wrote it accordingly, but with no purpose or thought of reassuming any responsibility for the note. That as to this letter, written by the clerk, who was also Rider's clerk, and is now dead, he never saw it until it was produced before the examiner; that the clerk had no authority to write it for him, and he denounced the whole affair as a trumped-up scheme to defraud.

A fact, in apparent confirmation of White's statement, is, that in the original bill filed in 1875, by George F. Rider, the complainant stated, under oath, that the whole of this balance of one thousand and ninety-three dollars and seventy-seven cents, with interest, is then due. The payment of this two hundred dollars was not then spoken of; for that

credit, if then admitted, would have reduced the debt from one thousand and ninety-three dollars and seventy-seven cents to eight hundred and odd dollars. But it was not until four years afterwards, when the last amended bill was filed, that we first hear one word said about this payment.

Lastly, Dulin, who, Rider asserted, witnessed the payment of the $200, was called as a witness by White (Rider having failed to call him), and he testified that he remembered nothing of any such payment, and that he never was in the house where Rider asserted the payment was made.

Upon the whole, we conclude that the evidence fails to support at all the idea that this two hundred dollars was paid on this note; and, therefore, we conclude that the defence set up by White is sustained; that this defendant was absolved from further liability by the family arrangement, and the whole responsibility for the note was then assumed by the deed of George F. Rider, and that he afterwards released it on the record. When he comes in himself, as an executor to claim this money, and is confronted by his release, under seal, recorded and giving notice to the whole world, he must get some other evidence than his own testimony to sustain his claim.

Further, it appears that Lucy Rider bequeathed this particular note to a son of George F. Rider, namely, George N. Rider, by a codicil to her will, and therein she describes the note, particularly, as being secured by a deed of trust executed by George F. Rider, February 13, 1855, to Hamilton, and gives the folio and liber in which the deed of trust is recorded. When Rider is asked, on cross-examination, how that information was communicated to his mother, he admits that he sent it to her, with a view to its insertion in her will.

There is another defence, however, which would be perfectly satisfactory to us, if it stood alone, and which, when taken in connection with the state of the proof, is conclusive; and that is the staleness of the claim. This bill was filed on the 8th of February, 1875. The original note and mortgage were given April 30, 1851, by George F. Rider to his mother. The note was to be paid in three years, and, there-

fore, became due on the 30th of April, 1854, which was twenty years and ten months before the filing of the bill. On the following September 4, 1854, White and his wife executed the deed of trust to Pearson, which it is attempted to foreclose in these proceedings. Now, that was twenty years and five months before the filing of this bill. Suppose, however, that the $200 was actually paid on this note by White on the 2d of March, 1855. Then that date is nineteen years and eleven months and six days before the filing of the bill—about twenty-two days less than twenty years. Although the Statute of Limitations is not formally pleaded, the defence of laches and staleness is urged to the enforcement of this claim. The law on the subject is very well expounded by the writers, and I cannot find a better statement of it than this, which I read from Story's Equity, sec. 1520:

"The statutes of limitations, where they are addressed to courts of equity, as well as to courts of law, as they seem to be in all cases of concurrent jurisdiction at law and in equity (as, for example, in the matters of account), to which they directly apply, seem equally obligatory in each court. It has been very justly observed that in such cases courts of equity do not act so much *in analogy* to the statutes as *in obedience* to them. In a great variety of other cases, courts of equity act upon the analogy of the limitations at law. Thus, for example, if a legal title would, in ejectment, be barred by twenty years' adverse possession, courts of equity will act upon the like limitation, and apply it to all cases of relief sought upon equitable titles or claims touching real estate. Thus, for example, if the mortgagee has been in possession of the mortgaged estate for twenty years, without acknowledging the existence of the mortgage, it will be presumed that the mortgage is foreclosed, and that he holds by an absolute title. If the mortgagor has been in possession of the mortgaged estate for the like space of time, without acknowledging the mortgage debt, it will be presumed to be paid. If the judgment creditor has lain by for twenty years without any effort to enforce his judgment,

and it has not been acknowledged by the debtor within that time, it will be presumed to be satisfied. And in all these cases courts of equity will act upon these facts as a positive bar to relief in equity. But a defence, peculiar to courts of equity, is that founded upon the mere lapse of time, and the staleness of the claim, in cases where no statute of limitations directly governs the case. In such cases, courts of equity act sometimes by analogy to the law, and sometimes act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere, where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights."

The author describes precisely this case. The mortgagor was in possession of this property for a very long period without any acknowledgment by him of the debt. If we discredit the payment of the two hundred dollars on the note, there had been no recognition on his part of the debt for twenty years and five months before this bill was filed. Supposing, however, that payment to be established by the proof (which we have shown is not the case) then he was in possession nineteen years six months and eleven days from that time without such acknowledgment before this bill was filed. These men were not strangers, living far apart all these years—they were living side by side; they were brothers-in-law. Nor can this silence be ascribed to the existence between them of amicable relations, which they were unwilling to disturb. They had a falling out in 1865, and the report of Hood, the referee, shows that in bad faith Rider tried to get the advantage of White. So that none of these considerations avail to explain the delay.

The cases are numerous in which courts of equity have refused relief because of the staleness of the claim and unexplained laches, where the delay to sue was much less than twenty years.

In the case of McKnight *vs.* Taylor, 1 Howard, 161, a bill was filed in August, 1837, by a trustee, under a deed of trust executed in September, 1813, to enforce the payment

of one of the claims named therein, by a sale of the property. The Supreme Court, in refusing to enforce the deed, uses this language in the opinion delivered by Chief Justice Taney: "In relation to this claim, it appears that nineteen years and three months were suffered to elapse before any application was made for the execution of the trust by which it had been secured. No reason is assigned for this delay, nor is it alleged to have been occasioned in any degree by obstacles thrown in the way by the appellant. As the record stands, it would seem to have been the result of mere negligence and laches. * * * If, indeed, the suit had been postponed a few months longer, twenty years would have expired, and in that case, according to the whole current of authorities, the debts in the schedule would all have been presumed to be paid. But we do not found our judgment upon the presumption of payment, for it is not merely upon the presumption of payment or in analogy to the Statute of Limitations, that a court of chancery refuses to lend its aid to stale demands. There must be conscience, good faith and reasonable diligence to call into action the powers of the court. In matters of account, where they are not barred by the act of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice, where the original transactions have become obscure by time, and the evidence may be lost."

So in Wilson vs. Hagerstown Bank, 27 Maryland, 51, the court held that an equitable mortgagee was barred by laches in waiting until 1859 to set up a claim which accrued about 1851.

In Hawkins vs. Chapman, 36 Maryland, 101, the court, in refusing relief upon the same ground, says: "It thus appears that seventeen years elapsed before any attempt was made to execute the trust, and then the bill was filed against the widow and heirs of the purchaser twelve or eighteen months after his death, and several years after the purchase."

And in Hall vs. Clagett, 48 Maryland, 223, the court dis-

40

missed a bill filed in 1856 by a surviving partner against the representatives of the deceased partner, who died in 1855, for an account of the copartnership dealings, extending back many years, and which had been dissolved in 1842. In refusing to interfere under the circumstances, the court says: "The repose of titles and the security of property are mainly promoted by a full enforcement of the maxim, '*vigilantibus non dormientibus jura subveniunt.* The spirit of the maxim '*interest reipublicæ ut sit finis litium,*' may be traced to a more remote period than the Christian era. The language of the civilians, and of the commentators upon the common law, has been that the dominion of things must not for a long time remain uncertain, so as to disturb the peace of society by giving rise to innumerable and perpetual litigations."

"To prevent such evil, the indolence of those who are dilatory in recovering their property and claiming what is due to them, should be punished, and they should impute to themselves the punishment." Angell on Lim., § 9.

We have no hesitation, in view of these principles and their application in these and numerous other cases, in declaring that the bill was properly dismissed by the court below.