(Superior Court of Cincinnati.)

Special Term—November, 1891.

HIRAM D. PECK, ADMINISTRATOR, DE BONIS NON, WITH THE WILL ANNEXED OF BARTHOLOMEW CAVAGNA, DECEASED v. PETER CAVAGNA.

---

1. When from the books of a partnership, or from the books taken in connection with evidence outside of the books, it is impossible to state an account between two partners and the situation is attributable not to the neglect of any one of the partners but to the course of business adopted and followed for a long period of time by all of them, the law leaves the partners where it finds them and refuses to interfere by a settlement of the partnership otherwise than to decree an equal distribution of the assets remaining on hand.

2. Bartholomew Cavagna and Peter Cavagna were partners for a long period of time. Bartholomew had paid large amounts into the firm from time to time, the result of the sale of his individual property, and Peter had drawn out large amounts for his individual use. Bartholomew, upon his death, left a will containing among other items, the two following: Item I. I desire that all my debts including all accounts, notes, acceptances and all other evidences of indebtedness, in whatsoever hands they may be, against the firm of B. Cavagna & Son, composed of myself and my son, Peter Cavagna, be first paid out of my estate.

Item II. I give, devise and bequeath to my son, Peter Cavagna, the stock in trade, book accounts, fixtures, bills receivable, and all other personal property belonging to the firm of B. Cavagna & Son. I make this bequest as also the provision for the payment of the debts of said firm as directed in item 1, for the reason that my said son Peter, has aways devoted himself to my interests and contriubted largely to the accumulation of my estate, and I wish him to have and continue the business which he has helped to build up free, and discharged from any and all liability of indebtedness.

Held :—That by the terms of the will above set forth, the intention of the testator was to give the entire business to Peter Cavagna, including the money paid by him into the firm and rendered unnecessary an accounting of the partnership affairs between the estate of the testator and Peter Cavagna.

---

SMITH, J.

The substantial allegations of the petition are, that on or about the 10th day of April, 1867, Bartholomew Cavagna was engaged in carrying on the grocery and liquor business in the city of Cincinnati, Ohio; that at that date he associated his son, Peter Cavagna, in the business with him, and gave him an undivided one half interest in the business; and that said business under the name of B. Cavagna & Son, was carried on with great profit until the 17th day of April, 1889, when Bartholomew Cavagna died; that at the time of the formation of the partnersihp, Bartholomew Cavagna was the owner of a large and valuable farm upon which he conducted a dairy, and was the owner of other valuable pieces of real estate; that the said Bartholomew Cavagna was unable to read or write and was feeble in mind and body; that the said Peter Cavagna, by undue in-

fluence, obtained absolute control of the said Bartholomew Cavagna and of all his business and property; that he appropriated the great bulk of the profits to his own use; that he compelled Bartholomew Cavagna to sell the farm and dairy, and to turn the proceeds into the business; that he compelled him to allow the rents of his other property to go into the business, and that such proceeds were afterwards in a large measure, checked out by said Peter Cavagna and appropirated to his own use; that the fact of the comingling of the moneys belonging to the deceased as aforesaid, with the said funds of the firm and the appropriation of a part of them by the defendant, were not known or understood by the deceased, by reason of his said disabilities and the concealment thereof by the defendant; that he is unable to state fully or accurately the amounts of such payments of the original moneys of the deceased into the account of the firm or the appropriations thereof of the same by the defendant for his own use: but says that said transactions occurred at intervals extending over the entire period of said partnership, and a true statement thereof can only be had by taking an account of all the transactions of said firm and of the dealings of the defendant and his deceased father therewith; that no account was ever stated between the said deceased during his lifetime and the defendant, and no settlement ever made between the parties as to the transactions of said firm or as to said large amounts of money collected as aforesaid, and that all aforesaid were, at the time of the death of said deceased, wholly unadjusted between the said parties and are still so unadjusted and that said defendant has refused and still refuses, either as executor or as an individual, to account for or pay over any part of the funds so appropriated by him, but on the contrary, the defendant denies and repudiates any liability in the premises.

The petition therefore prays that an account may be stated between the plaintiff and the defendant as to all the matters, and that he may have judgment against defendant for such sums as may be found due from the defendant to the plaintiff and such final adjustment, and such other and further relief to which in justice and equity he may be entitled.

The answer set up two defenses. In the first defense it is averred that at the time of the formation of the partnership, Bartholomew Cavagna was very largely in debt, and that for the purpose of paying his debts and for the purposes of carrying on said farm and for such other purposes, Bartholomew Cavagna, form time to time, drew out of said firm and appropriated to his use large sums of money, the amount of which defendant is not able to state, but that it is greater than the interest of Bartholomew, either in the business or the profit of the concern; that in view of the fact of the large amount of money which he, Bartholomew Cavagna, had taken out of the said firm for his own use, and because he agreed to do so, he paid into the firm the proceeds of the dairy and farm.

It is further alleged in this defense that it was impossible to get the said Bartholomew Cavagna to keep with the defendant an accurate account of the moneys taken out by the said Barthollomew, from the said firm, and that "no true and complete account can now be made up showing the transactions of the said firm, and the relations of said partners thereto." That it was always intended by the said Bartholomew Cavagna, that this defendant should have the whole of his business at his death; that he is not indebted to the said Bartholomew Cavagna, or his estate, but that if a true accounting could be had, said Bartholomew Cavagna would be indebted to him.

For a second defense the defendant sets out the last will and testament of the said Bartholomew Cavagna, and claims that "by the terms and provisions of said will, the said Bartholomew Cavagna intended to and did devise and decree to the defendant, all the right, title and interest, in and to all matters and things set up in the petition, and any and all claims which he had or which were in any way connected with the late firm of B. Cavagna & Son free, and discharged from any and all liability and indebtedness."

To this answer plaintiff replied, averring that none of the money of Bartholomew Cavagna was paid into the firm because of his indebtedness to the firm, but avers it was paid in without consideration, and denies that any of the claims set forth in the petition were given or decreed by the will.

The taking of testimony was begun and continued with various unavoidable interruptions, for over a year. This testimony, reduced to writing, embraces nearly nine hundred pages of typewritten matter—exclusive of many hundred pages of exhibits - and exclusive probably, of a hundred books used in the business, such as ledgers, cash-books and check-books.

The determination of every case, however voluminous or extended the testimony may be, and whether it be a case in law or equity, always finally resolves itself into two questions, viz., one of fact and one of law; and after some reflection as to the best method of presenting the conclusions I have reached in this case, it has seemed to me, that a determination, first of the facts as proven, and second, of the law applicable to those facts, would be the natural and altogether the simplest and clearest method of presenting such conclusions.

I proceed, therefore, to inquire first—what does this evidence show to be the facts.

A great many facts in the case are admitted by both sides, or if not admitted, are so clearly proven as to have the force of accepted facts and have been so treated in the argument of the case. As the statement of such facts will eliminate them from the discussion and more clearly and prominently bring into view those facts which are disputed, it has seemed to me advisable at the

outset, that such a statement should be made.

Bartholomew Cavagna was born in Italy, but emmigrated when a young man to this country. He early came to this city, where the greater part of his life was spent, and died on the 17th of April, 1889, at the age of ninety-one years. His early education was neglected, and he never learned to read or write. Like most foreigners who come to this country, he was poor, but he was possessed of good health, native business shrewdness and habits of thrift, and in the year 1867, he is found engaged in the grocery and liquor business, and the owner of three pieces of real estate in the city of Cincinnati; one, the store on Fifth street where the business was carried one and another on the north-west corner of Fifth and Sycamore, and a large farm outside of Cincinnati, where he carried on the business of a dairyman, farmer and stock raiser.

He was a married man, and had three sons who grew to manhood, John, Anthony and Peter. The testimony as to John is very meagre. It does not appear in what business he was engaged or when he died. It does appear that he had a widow and children who are now living, but there is no evidence to show that Bartholomew Cavanga ever visited them or that they ever visited him, or that he ever manifested any interest in them or ever contributed anything to their support. Anthony Cavagna is still alive. He appears to have been engaged with his father at one time on the farm, but during the greater part of his life he has not been engaged in any business with his father. His habits at time have been dissipated, and the relations between him and Peter have not been friendly. But the father always bore an affection towards him and repeatedly furnished him and his family with groceries from the store: although there is no evidence to show that Bartholomew ever visited them or that they ever came to the store to visit him.

For many years prior to the year 1867, Peter Cavagna had been a clerk in his father's store, but had not accumulated any money, nor was he the owner of any property; but on the 10th of April, 1867, his father gave him an undivided one-half interest in the business, and made him an equal partner in the same.

The only evidence of the terms of the partnership is a statement in an old ledger; and the testimony of Peter Cavagna in the probate court; the statement in the ledger is as follows:

"Cincinnati, April, 1867.

Bartholomew and Peter Cavagna have this day entered into a co-partnership under the style and firm of B. Cavanga & Son, for the purpose of transacting a general grocery business, investing in equal amounts, and to share alike in gain and losses."

Immediately succeeding this, follows a statement of the resources and liabilities of the concern. The resources appear under an entry of "Sundries to Sundries.

| | |
|---|---|
| Bartholomew Cavagna, | $13,033.81. |
| Peter Cavagna, | $13,033.80. |
| Merchandise on hand, | $20,000.00 |
| Cash, | 40.00 |
| Personal accounts as below, | 6,027.61." |

The statement as to the liabilites of the concern is as follows:

"We owe as follows:
Sundries to Sundries.

| | |
|---|---|
| Bartholomew Cavagna, | $5,129.34 |
| Peter Cavagna, | 5,129.34." |

Following this statement appear the names of the various creditors of the concern, in amount aggregating $10,258.68.

The statement of Peter Cavagna which appears from the testimony taken in the probate court is, that he was given a half interest in the business, and, that when his father took him as a partner, he, Peter, told him he would help him pay his debts Whether this statement of Peter Cavagna to his father constituted a part of the partnership arrangement, and whether it referred solely to the partnership debts or whether it included also his personal debts; or whether indeed Bartholomew Cavagna at that time, had any personal debts, does not appear from the testimony.

The partnership having been entered into on the 10th of April, 1867. and having ended by the death of Bartholomew Cavagna, on the 17th of April, 1889, was in force for over twenty-two years. The inventory of the appraisers filed in the probate court, shows that the total invoice of the stock is $12,359.166. The total aggregate of the book accounts is $6,120.81, and the total aggregate cash in bank and in the store was $657.49, making the total assets $19,137.46. The liabilities of B. Cavagna & Son to all parties other than the parties to this suit, as they appear from the books, are $11,328.72. With the money of the firm, however, there had been purchased on June 4, 1876, for $8,500, the property on the north-east corner of Sixth and Walnut, and the title to the same taken in the name of Bartholomew and Peter Cavagna, where it remained up to the time of the commencement of this action.

It appears also, that on or about 1870, there was a large and disastrous fire on the farm, which destroyed a large amount of cattle and other property, and for which there was no insurance. Afterwards, in August, 1873, the dairy was sold by B. Cavagna to Frank Weihe. for $8,500, and the money paid into the firm business. On the 5th of June, 1875, the farm real estate was sold by B. Cavagna to Joseph and G. W. B. Cleaney, for the nominal consideration of $140,000, made up of $45,000 in cash, a piece of real estate on the corner of Second and Race, valued at $25,000, and five notes of $14,003.12 each, secured by mortgage on the farm. Of these notes, at the time of Bartholomew Cavagna's death, the last note had not been entirely paid. The entire proceeds which had been realized from this sale to the time of Bartholomew Cavagna's death had been turned into the business of the firm. The

$45,000 cash was used to take up the note of the firm for $45,000, with accumulated interest held by the First National Bank of Cincinnati. Of this $45,000, therefore, only $35,000 in money actually went into the firm. The remaining $10,000, the firm owed to Bartholomew Cavagna, for interest paid by him on its note of $35,000. The property on Second and Race streets, valued at $25,000, realized only $15,000. At the time of Bartholomew Cavagna's death, the last note had not been entirely paid. But without stopping now to make an exact calculation as to the amount that directly or indirectly went into the business from the proceeds of the farm, it is safe to say that the amount was in the neighborhood of, and not less than, $125,000 extending over a period of nearly fifteen years, from 1875 to 1889.

It also appears that the rents collected from the property on the corner of Second and Race Street, and owned by Bartholomew Cavagna, were paid into the firm; that the rents collected from the property on the north west corner of Fifth and Sycamore, owned by Bartholomew Cavagna, were for many years preceding his death, also paid into the firm: and that the taxes and repairs of the property were also paid out of the firm money.

Owing to the imperfect account kept of such disbursements and collections, it is impossible to accurately say what they are, but the balance in favor of the collection amounts to several thousands of dollars.

The following transfers and purchases of real property appear to have been made during the period covered by this partnership. On the 27th of April, 1877, a deed was made by Bartholomew Cavagna to Peter Cavagna for $1.00, love and affection, of the property on Fifth street where the business was carried on, and the same property was then conveyed for the same consideration through Arabela Caswell the mother-in-law of Peter Cavagna, to his wife Juliette Cavagna, who is now, and has ever since, been the owner of the same. On July 10th, 1884, a deed was made by James Dalton to Juliette Cavagna, of the property on Oak street for $11,000, subject to a mortgage of $4,000; on August 17th, 1874, a deed was made by William J. Bellamy to Juliette Cavagna, of property in Kemper's estate Walnut Hills. It also appears that Juliette Cavagna was the owner of a small piece of property in Cumminsville, but it does not appear that she purchased it during the partnership. A deed was also made by Charles H. Allen to Peter Cavagna, dated January 9th, 1885, of residence property on Eighth street for $17,100, subject to a mortgage.

It is also in evidence that Bartholomew Cavagna, on the 17th of September, 1878, executed a will, which has been duly probated as his will, and now remains uncontested. It also is in evidence that Peter Cavagna drew all the checks that were drawn of B. Cavagna & Son, and that he kept a private account of his own. It is also beyond dispute that although some effort seems

to have been made at the beginning of the partnership account, to keep an accurate and proper set of books, yet, it was afterwards abandoned; that it is now impossible from the books to state an account between the partners which even approximates remotely to any degree of accuracy; and that for years the only purpose which has been subserved by the keeping of such books, has been the keeping of the accounts of the partnership with its customers, and those from whom it purchased goods.

As in my judgment, this inability to state an account from the books is a fact of great importance in the determination of this case. I deem it proper not to rest merely with the statement of this fact, but to refer to the evidence which supports it.

(The court here reviews the evidence upon this subject.)

The statement as to the condition of the books of B. Cavagna & Son which I have just made, completes the enumeration of those material facts which are either admitted or must be accepted as beyond dispute in this case, and we are now to enter upon the domain of disputed facts. But before proceeding to an examination of the evidence which each side has adduced upon the facts in dispute, it will be advisable, I think, to re-state the substance of the claim made by each side as it has developed itself from the pleadings, arguments of counsel and evidence, in order that it may be clearly seen what facts are in dispute.

The claim of the plaintiff, to quote again from the petition, is "that the said deceased was wholly illiterate, being unable to read or write, and was old and feeble in mind and body, and that the said Peter Cavagna had, by reason of the said disability, and the confidential relation existing between them as father and son and as partners, and by long association with said deceased before the formation of said partnership, and after said formation, acquired the most absolute control over the deceased who most implicitly obeyed in all things the said Peter Cavagna, during the whole term of said partnership; and the said Peter exercised during all the said term absolute control, not only over the partnership affairs of said firm, but over the individual property of deceased:" and that, "the payment of said individual moneys of the deceased in the bank account of said firm was caused and instigated by said defendant by means of an undue influence and control exercised by him on said Bartholomew Cavagna, and by an abuse of the confidential relations existing between them as by reason of his age and disabilities, said Bartholomew was unable to understand or resist the movements or purposes of defendant: that the latter caused said moneys of deceased so to be paid into the account of the firm for the purpose and with the intention of appropriating them to his own use, and subsequently consummated this scheme of fraud by appropriating the same to his own use as aforesaid."

The contention of plaintiff is, that as the evidence adduced in this case sustains these statements of fact in the petition, that the condition of the books is owing to the failure of Peter Cavagna to properly keep them, and that he is in this action of accounting, chargeable with re-payment of the full amount paid into the business by B. Cavagna, and the full amount which it appears he has drawn out of the business; and that he is entitled to off-set against these charges only such items as appear from the books as proper subjects of off-set, or that he can show he is entitled to as off-sets by other evidence than the books. In other words, that as he kept the books he is chargeable with all they show against him, and if they have been so loosely kept as not to be an accurate record of the business, the fault is his, and he cannot set up such a condition as a defense.

It is also further claimed by the plaintiff, that as Peter Cavagna had no other source of income than the business, he is to be charged with what it would appear from evidence outside of the books, he must have drawn out of the firm, namely, money used in living expenses and in the investment of real estate.

But this conclusion which the plaintiff reaches from the facts as he claims them is a conclusion of law from the application to the facts of the principles of law by which they are to be governed; but we are not concerned at this immediate time, with questions of law but solely with questions of fact, and I pass over, for the moment, the question of law involved in this contention.

Upon the part of the defendant on the other side, it is contended that the evidence not only fails to prove the existence of a state of facts such as the plaintiff contends has been proven, but that the evidence proves the existence of a contrary state of facts, namely: That Bartholomew Cavagna was a man remarkably sound both in body and mind from the time of the formation of the partnership until its close, with the exception of the last few years of his life, when he was naturally and necessarily failing through old age; that all the money belonging to him which went into the firm went in with his knowledge and consent; that he was aware of the manner in which Peter Cavagna lived and of his purchase of real estate; and that he not only approved of such purchases but urged upon Peter Cavagna the making of the same; that the omission to properly keep a set of books which would accurately record the transactions of the concern was not only with his consent but upon his urgent request and insistance; and lastly, that the said Peter Cavagna did not have nor exercise undue influence over the said Bartholomew Cavagna; and that none of the things complained of by plaintiff were the result of such undue influence.

It will be found, I think, upon examination and reflection that all disputed questions of fact finally resolve themselves into two questions. First:—Was Bartholomew Cavagna of such soundness and strength of mind that Peter Cavagna could exercise an undue influence over him; Second:—Did Peter Cavagna exercise an undue influence over Bartholomew Cavagna with reference to the business of B. Cavagna & Son and especially with reference to the payment into the firm of the individual money of Bartholomew Cavagna; the payments out of the firm to Peter Cavagna; and the manner of keeping the books of the firm.

And it will be found, I think, upon further examination and reflection, that all the testimony adduced to show undue influence falls under one or more of the following classes. First:—Testimony with reference to the purchase of horses by Bartholomew Cavagna. Second:—Bartholomew Cavagna's manner of making presents of groceries and other things in the store to his son, Anthony Cavagna. Third:—The admissions of Peter Cavagna. Fourth: The conduct of Bartholomew Cavagna and Peter Cavagna in the carrying on of the business of B. Cavagna & Son.

Before beginning a discussion of the testimony it may be observed that in discussing the evidence for the purpose of determining what facts are upon the whole proven by it, a discussion of the question upon whom rests the burden of proof is not necessarily material. The inquiry in regard to each question of fact is, what does the testimony in regard to it fairly prove. If we find the testimony falls short of proving either side of any controverted fact so that the truth as to that fact is left in doubt, or depends upon the question as to which side has the burden of proof, then the question upon whom rests the burden of proof becomes important; otherwise it does not.

It is also to be observed that whatever may have been the view entertained by the plaintiff at the time of the filing of this action as to the soundness of mind of Bartholomew Cavagna, the evidence has placed the fact beyond all doubt that his mind was not unsound, and that he did not have the slightest taint of imbecility. The contention now is, that while his mind was sound, it was not sufficiently strong, in the language of the petition "to resist the movements and purposes of Peter Cavagna."

I now proceed to examine the testimony with reference to the purchase of horses by Bartholomew Cavagna, and I shall make such examination at some length because by far the greater part of the plaintiffs' testimony on the subject of undue influence consists of this testimony.

(The court here reviews the testimony on that subject, and states its conclusion as follows:)

The criticism which I have just made upon this testimony, standing by itself, and which tend to weaken its force, and reliability, are: First—That it comes almost exclusively from horse traders whom Peter Cavagna probably may have offended. Second—That there is very strong testimon .

opposed to it, showing that Bartholomew Cavagna did purchase horses whenever he wanted to regardless of Peter's opposition.

Third—That in almost all of the instances testified to a fair construction of the testimony would be, that the purchase was to be a firm purchase and Peter's refusal to allow it was not an exercise of undue influence over his father. Fourth—That there is an entire absence of bad motive shown to exist upon the part of Peter Cavagna, whereas there is considerable testimony to show a good motive upon his part. Fifth—That the alleged admissions of Peter Cavagna prove too much.

And yet, notwithstanding these elements of weakness in the testimony, inasmuch as there is testimony which, fairly construed, must mean that Peter Cavagna, whatever his motive may have been, was able at times to prevent his father from making purchases of horses out of his own means, and that this occurred at times when no reason appears why Bartholomew Cavagna could not, if he had insisted, have made purchases out of his personal means, (the testimony is such as to arouse suspicion as to any acts or transactions of Peter Cavagna and his father in their business relations and to call for a careful investigation as to such acts or transactions.

If in any such acts or transactions we should find testimony that Peter had taken advantage of his father or had compelled him to submit to any undue influence on his part, then the doubt which exists as to the reliability of the testimony relating to the purchase of horses may be resolved against Peter and go to support and confirm the proof against him; but if, on the other hand, such other testimony shows no undue influence upon the part of Peter, then the testimony in regard to the purchase of horses need not be again referred to.

I now turn to the examination of the testimony as to the manner in which Bartholomew Cavagna treated Anthony Cavagna as an evidence of undue influence over him by Peter Cavagna.

(After reviewing the evidence upon this subject, the court concludes as follows:)

It does not appear clearly, that Peter ever objected to his father making gifts to Anthony or John, or if there is any stray evidence in the record to that effect, the evidence as to the relations between Anthony and Peter, and John and Peter, and the habits of Anthony, make it quite credible that Peters' objections may have arisen from causes other than a desire to prevent his father giving away anything—even a few groceries—in order that there might be more for Peter to use or inherit.

And yet, although it may be true that Bartholomew's actions are to be explained by the fact that being of a kindly nature and with affection for both his sons, he did not want any controversy with Peter about assisting Anthony or John, whose presence at the store always excited Peter, it may also have been, and the testimony is not in-consistent with this theory of plaintiff, that he was afraid of Peter and afraid to assert himself against Peter's wishes. But this testimony, standing by itself, like that with regard to the purchase of horses, is unsatisfactory and inconclusive, but may be used to re-inforce and make more conclusive the testimony of Peter's domination or control, if the other testimony in the case makes it appear with any reasonable certainty.

I have now come to a consideration of the business relations between Bartholomew Cavagna and Peter Cavagna, and especially to the facts complained of, namely, the payment into the firm of the proceeds of the sale and the rental of the property of Bartholomew Cavagna; the drawing of money out of the firm by Peter Cavagna; and the condition of the books of the firm of B. Cavagna & Son, which condition makes it impossible to state an account between them.

First—As to the business relations generally between Bartholomew and Peter Cavagna; which inquiry necessarily involves an inquiry into the condition of mind of Bartholomew Cavagna, and especially with reference to the ability of Peter to control him.

Generally speaking, the witnesses of plaintiff consist of persons who went to the store to get their lunches or had dealings with the firm in transactions of a minor character. Their testimony in substance is, that Peter appeared to be the manager and "boss" of the business; that he attended to all its financial operations; that his father only busied himself about minor matters; and that Peter and his father frequently had altercations, which, however, were always carried on in Italian, and as to the nature of which the witnesses could only surmise. There is also testimony from some of the witnesses that after these altercations, Bartholomew Cavagna would walk away and cry; and there is also testimony that Bartholomew Cavagna frequently said he did not know where all the money went. And yet the great majority of the witnesses called by plaintiff, say, that Bartholomew Cavagna was a sensible man, and a good business man.

It is a significant fact that cannot be over-looked in this testimony, indeed it is one that stands prominently forth, that notwithstanding it is introduced for the purpose of showing undue influence upon Bartholomew Cavagna by Peter Cavagna, not a single instance is testified to where Peter had his own way in a business transaction in opposition to that of his father. The fact that he was more active than his father, indeed, that he was the manager, does not show undue influence over his father, because Peter naturally would have occupied that position in the business, being the younger of the two, and the entire capital of the firm having been contributed by his father, nor would the fact that he drew the checks and appeared to have charge of the

finances show undue influence: for necessarily he would so act, inasmuch as he could read and write, and his father could not. It is true that the frequent altercations carried on in Italian, and the subsequent walking away by Bartholomew Cavagna, are pointed to as instances of Peter Cavagna's control; but as no one has testified who understood their conversations, the testiomny in regard to that, is of little weight; and the testimony as to the crying of Bartholomew Cavagna, in view of the testimony of Dr.. Ravogli, that he had an affection of the eyes which would give that appearance, becomes untrustworthy and incredible.

Upon the part of the defendant a number of witnesses have been called, nearly all of whom are of the very best reputation and standing in the comumnity,—business men, —the family physicians of Bartholomew Cavagna,—and Judge Sage of the United States court. Such well known business men as Henry O. Stlyes, Daniel Andrews, Jeremiah Cooper, Francis Pentland, Frank Weihe, Charles Stewart, Thomas Donaldson, John L. Miller, Joseph J. Gest and others, testified from a personal acquaintance and from years of business dealings with Cavagna & Son, that Bartholomew Cavagna was a man of remarkably sound and strong mind, and some of them say that he was a better and shrewder business man than Peter. Dr. Ravolgi and Dr. Ehrmann have not the slightest doubt of the soundness and strength of his mind, and Judge Sage's testimony is clear and strong to the same effect.

In view of this testimony on behalf of the defendants a mere summary statement of it such as I have just made, does not give a true appreciation of its weight and in view of the importance which I attach to it, I have felt at liberty to refer to it more in detail.

(After a more detailed statement of this testimony the court concludes as follows:)

In view of the testimony on behalf of the defendant, I see no escape from the conclusion that although there is a conflict of testimony between plaintiff's and defendants' witnesses, as to whether, generally speaking, Bartholomew was under the control of Peter Cavagna, the weight of the testimony is with the defendant; that the plaintiff has failed in establishing the fact of such control; and that the contrary fact has been established by the defendant.

But what does the testimony show as to the particular business transactions complained of, viz: First—The payment of the proceeds of the sale of and rental from the real estate of Bartholomew Cavagna into the firm. Second—The drawing out of the firm by Peter Cavagna of money for living expenses, and Third—His purchase of real estate?

(The court after reviewing the testimony on these matters, concludes that the action of Bartholomew Cavagna with reference to

the same was voluntary and not the result of undue influence.)

I come next to inquire as to the last of the great facts in dispute connected with the business relations of Bartholomew and Peter Cavagna, viz:—The responsibility for the condition of the books which makes it impossible to state an account between them.

(After reviewing the testimony on this subject, the court finds that Peter and his father were equally responsible.)

The difficulty, or rather the impossibility, of stating an account between these two partners arises not alone from the fact that it is impossible to state accurately what amount of money each partner drew out of the business, but also from the fact that it is impossible to state from the evidence whether the business was profitable or unprofitable, and if so, to what extent; and also, from the fact that from the formation of the partnership in 1868, up to the sale of the farm to the Cleaneays, a period of seven years, the receipts and expenditures were not kept separate from those of the business; and the testimony of Rowe is, that up to the time of the disposal of the farm, the joint enterprises of the farm and business were run at a loss.

As it is impossible to state an account between these partners, either from the books alone, or from the books taken in connection with the evidence outside of the books, and as this situation is attributable not to the neglect of Peter Cavagna, but to the course of business adopted by the two partners and followed for nearly a quarter of a century, the law leaves the partners where they stand and refuses to interfere by a settlement of the partnership otherwise than to decree an equal distribution of the assets remaining on hand. The following authorities conclusively show that such a rule is the only one a court can adopt:

In Slater, Myers & Co. v. Arnett et al., 81 Va. Reports, 432, in an action for an account between a living partner and the estate of his dead partner, it was held that, "where a suit in equity is instituted to settle the accounts of a dissolved firm, one of the members being dead, and the report of the master to whom those accounts have been referred, shows, that after diligent search, he has been unable to discover and report any evidence whatever to base a statement of the true condition of affairs between the members of the late firm, and of its assets, etc.. the court not being able to proceed to judgment upon suppositions and presumptions without evidence, can do no better than to with-hold its hand, and to leave the parties to stand where they had placed themselves before suit was brought." In the corner of the decision the court uses this language, which has peculiar significance at this time,—page 441:—"And, as the partnership transactions cannot be settled upon any basis at all rational now, the books being so badly kept as to be worthless, and there being no evidence produced on either side upon which a court could proceed toward

any re-arrangement of the affairs,—what can be done except to leave them as the brothers did, when both were living and arranging their business between themselves.''

And in Ashley, respondent, v. Williams, Admr., of Miller, 17 Oregon, 44, it was held that ''In a suit for partnership account-ing, where there are issues as to the exist-ence of the partnership and the state of its affairs and business, or the state of the ac-counts between the partners, the burden of proof is on the plaintiff; and if he cannot furnish sufficient evidence to enable the court to state a partnership account, his suit necessarily fails to that extent;'' and in that case the court said: ''Owing to the impos-sibility of reaching a satisfactory conclusion as to the true state of the accounts between these parties, we have determined to direct that they be adjudged settled and closed, and that ne.ther take or recover anything as against the other.''

In R⁀ck v. Neitzy, 1 Mackey's Reports, (D. ⁀C. ) 21, the supreme court of the District of Columbia held, that :—''Where there is a dispute in regard to partnership matters and the parties have been so negligent as to lose the evidence of the partnership, and have kept their accounts in so confused a way that the court cannot see what decree would do justice between them, the bill will be dismissed.''

And in the case of Hall, Admr. v. Clagett, 48 Md., 243, which was an action for ac-counts between the administrator of a de ceased partner and the living partner, it was said :—''Such a court (equity) will not grope its way in utter darkness and undertake to create and establish a claim upon mere con-tingencies or the preponderance of mere pos-sibilities. There is no duty devolving upon it to assume the impractic-able task of adjusting the relative rights of these partners, where the proof is utterly deficient and inconclusive.''

I come now to consider the will of Barth-olomew Cavagna, with reference to its effect upon the partnership.

It appears that the will was made on the 17th day of December, 1878, was admitted to probate in the probate court of Hamilton county on the 6th day of May, A. D., 1889, and is at the present time in full force, hav-ing never been set aside or contested.

The parts of the will which relate to the partnership, are items 1 and 2, and read as follows:

''Item I. I desire that all my debts includ-ing all accounts, notes, acceptances and all other evidences of indebtedness, in whatso-ever hands they may be, against the firm of B. Cavagna & Son, composed of myself and my son, Peter Cavagna, be first paid out of my estate.

Item II. I give, devise and bequeath to my son, Peter Cavagna, the stock in trade, book accounts, fixtures, bills receivable and all other personal property belonging to the firm of B. Cavagna & Son. I make this be-quest, as also the provision for the payment of the debts of said firm as directed in item

[OOYRIGHT, 1897, BY CARL G. JAHN.]

1, for the reason that my said son, Peter, has always devoted himself to my interests and contributed largely to the accumulation of my estate and I wish him to have and con-tinue the business which he has helped to build up free and discharged from any and all liability of indebtedness.''

It is not disputed by the plaintiff that the language of the will, ''I give, devise and be-queath to my son, Peter Cavagna, the stock in trade, book accounts, fixtures, bills re-ceivable and all other personal property be-longing to the firm of B. Cavagna ''Son'' is sufficient to entitle Peter to the stock in trade now in the store, the fixtures of the store, and outstanding claims against cus-tomers; but the contention is strenuous-ly insisted upon that the remaining language of the will is not sufficient to relieve him from the payment of any amount of money that will be due from him to B. Cavagna upon an accounting between them, and that a very large amount has been shown in this case to be due upon such an accounting be-cause of the payment into the business by Bartholomew Cavagna of large sums of money and the withdrawing by Peter of large sums of money.

This contention is based upon the ground that the provision in the will is merely for the payment of the debts of the firm of B. Cavagna & Son ; and that advances by a partner of the firm and payments by the firm to a partner are not firm debts or cred-its, for it is impossible to say until the ac-counts of the partners are balanced, whether the firm in the one case will be indebted to the partner, or, in the other case, the partner will be indebted to the firm ; and that after the accounts are finally settled and balanced the difference between them becomes an in-dividual indebtedness from one to the other.

The two principal authorities relied upon by plaintiff in support of its contention are: Richardson v. The Bank of England, Mylne & Craig's Reports, 165, and Wilson v. Sper, 13 B. Monore, 411. In the first case, it was decided that ''the advances made by one partner to the partnership, and those receiv-ed by another from it, until the concern has been wound up, only constitute items in the accounts between the partners and cannot be treated as debts ; and the court therefore will not, upon an interlocutory application order the amount of such advances to be paid in and secured pending a suit for taking the partnership accounts.''

''Advances to the firm by one of its mem-bers do not constitute debts of the firm, but merely matters of account between the part-ners to be settled in the final adjustment of the partnership.''

Now, it may be true, as contended by plaintiff, that under the principal laid down in these cases, the language of the will in item 1, in which the testator desires all in-debtedness of the firm of B. Cavagna to be paid out of his estate, is not sufficient to carry the advances made by the testator to said firm ; and that the language in item 2, that, I give, devise and bequeath to my son,

Peter Cavagna, the stock in trade, book accounts, fixtures, bills receivable, and all other personal property belonging to the firm of B. Cavagna & Son" is not sufficient to carry advances made by the firm to Peter Cavagna, although I have grave doubts on this point.

Lindley on Partnership, sec. 320-384.

2 Bates on Partnership, sec. 849.

But if that point, for the sake of argument, be conceded to plaintiff, it is not decisive of the question whether such advances by B. Cavagna to the firm, and such advances by the firm to Peter Cavagna, are carried by the will.

It must be borne in mind that we are construing a will: that the purpose of such construction is to determine the intention of the testator; and that the rule in Ohio is, that no technical expressions or rules will be allowed to over-ride the clear intention of the testator. Therefore, to arrive at such intention we must regard not only a separate part of the will, but the entire will with all its parts; and it will be remembered that after it is provided in item 1, that all the debts of B. Cavagna & Son shall be paid out of the testator's estate, he further provides in item 2, that he gives, devises and bequeaths to Peter, the stock in trade, book accounts, fixtures, bills receivable, and all other personal property belonging to the firm of B. Cavagna & Son, and that he makes this "bequest as also the provision for the payment of the debts of said firm as directed in item 1, for the reason that my said son, Peter, has always devoted himself to my interests and contributed largely to the accumulation of my estate, and I wish him to have and to continue the business which he has helped to build up free and discharged from any and all liability, for indebtedness."

Now, it is a fundamental proposition in the law of partnership, that if upon a settlement of the partnership affairs and the payment of outside parties, it appears that one partner is indebted to the other, such creditor partner is entitled to pay himself first out of the assets of the firm; and if an accounting were possible here and it should be determined as a result of that accounting that Peter Cavagna was indebted to Bartholomew Cavagna, the latter, or his estate, would be entitled to apply the stock in trade, cash, and all personal or any other kind of property belonging to the firm to 'the payment of that indebtedness. But to allow that to be done would be to act directly in conflict with the expressed will of the testator, which is, that Peter Cavagna is to have the business including stock, etc., free and discharged from any and all liability for indebtedness. It must therefore follow, that any such indebtedness as would arise upon the accounting was intended to pass and be extinguished by the will. If, therefore, I would be able to find that Peter Cavagna was entitled to Bartholomew Cavagna by reason of the partnership accounting, I would also be compelled to find that such

indebtedness was extinguished by the will. But this construction of the will, which we find the strict rule of law requires, conforms to what the extrinsic circumstances surrounding the will, (under the law of Ohio for determining the intention of the testator), show that intention to be.

The rules for the general construction of wills are well settled in Ohio. They are, that the intention of the testator is the central and controlling idea to which the court must endeavor to give effect; that "grammatical accuracy need not be observed in construing a will, but that it should be read with a view to the situation and circumstances of the testator with reference to the subject of his distribution and the object of his bounty;" Worman v. Teagarden, 2 Ohio St., 380, nor should it be construed technically but sensibly and liberally in order to effect the testator's intentions: neither should it be construed as to destroy all benefit from the devise if it can be consistently avoided.

Thompson v. Thompson, 4 Ohio St., 333.

In construing this will, I must not only assume the testator when he made it was of sound and disposing mind; but that he made it under such circumstances as I have previously found to exist with reference to Bartholomew Cavagna and Peter Cavagna and the partnership itself, so far as such circumstances have any bearing in determining the intention of the testator.

The circumstances to which I allude are the following: Bartholomew Cavagna knew that the price of the farm and dairy and the rents from his individual property had been paid into the firm with his direction or consent; he knew that Peter and he had drawn money from the business as from a common purse; that Peter had lived in a style more expensive than that in which he had lived, and that Peter had purchased various pieces of real estate with money that must have come out of the firm; that no accurate amount of the transactions of the business which had been carried on for twenty-two years had been kept; and that it was absolutely impossible for any one short of Providence to state an account between him and Peter.

The will having been made under these circumstances it seems to me that the only construction of the will that would carry out the intentiton of the testator, is that which gives the business to Peter Cavagna; directs the payment of all its debts by the executor; and makes unnecessary any accounting between the estate of the testator and Peter.

I have been urged by counsel for plaintiff, to adopt the theory that Peter Cavagna, from the time of his admission into the firm as a partner, was engaged in a scheme to appropriate the entire estate of his father by having the same sold and converted into money, the money paid into the firm of B. Cavagna & Son, and the same afterwards checked out for his individual benefit; and that he was enabled to do this by the exercise of an undue influence which he had over his father,

taken in connection with the fact that his father was unable to read or write.

It is not to be denied that there is some evidence in the case which gives color to that theory, but for the reasons given I have not been able to base a judgment upon it.

But it should also be said upon behalf of the defendant, that there is, in addition to the evidence I have referred to, some evidence which supports a theory directly contrary to the theory of plaintiff; and if the case were to be determined upon mere theories, there is quite as much ground for supposing the theory of the defendant to be correct as that of plaintiff. The theory to which I refer is, that Peter Cavagna was the only one of the children of Bartholomew Cavagna in whom he took much pride, and the only one whom he regarded as having been of any assistance to him in life, and the only one likely to retain what property or money was given to him, and that therefore he preferred that the greater part of his estate should go to him.

Thus, in referring to Peter, he said to Dr. Ravogli:—"This is about the only son that has done for me;" and to Frank Weihe said, "I only have one son and that is Peter;" and to Francis Pentland he said, just before his death, that he had provided well for Tony and that he thought it was his duty to fix things just as he had done, that Peter had always stuck with him in the business and been the only one,—and he also at that time spoke of John. He further told Pentland of a scene he had had with Tony, and said, "God have mercy on him." And Haelrin says that he spoke to the old man about Tony, and the old man laid the case before him; and in regard to John, the same witnesses says there was what he understood a mis-marriage, and that at one time John had to go around and do day's work; that the old man insisted upon the children coming to a certain rule of discipline, and that if they did not he was inexorable.

I have referred to this evidence, not because I have given it any weight in determining this case, but merely for the purpose of showing that if the case is to be determined upon a theory, there is another theory than that urged by plaintiff which would be entitled to serious consideration. But I have endeavored to put aside theories and determine the case solely upon the law and the evidence.

The ordinary rule is, that the costs of the action follow the judgment, but an exception is made to this rule in equitable actions, where in the judgment of the chancellor such a rule, under all circumstances of the case is inequitable.

In my judgment, the plaintiff was justified in bringing this action by reason of the condition of the partnership books and the other evidence coming to his knowledge, and I am of the opinion therefore, that the costs of the case should be equally divided between the plaintiff and the defendant.

The case has been ably presented and ably defended, but in my opinion the law and evidence are with the defendant. The pro-

ceeding will therefore be dismissed and the costs equally divided.

Hiram D. Peck, Edmund K. Stallo, and C. W. Gerard, for Plaintiff.

E. W. Kittredge, J. A. Jordan, and E. H. Kleinschmidt, for Defendant.

(Affirmed by Supreme Court without report, December 1, 1896.)